IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| V. | § | NO. 2:15-CR-87 |
| | § | ECF |
| JONATHAN KHALID PETRAS | § | |

### PETRAS MOTION IN LIMINE

Defendant JONATHAN KHALID PETRAS ("Petras"), through undersigned counsel, respectfully asks this Court to preclude the government from mentioning, referring, or alluding to the following matters in the presence of the jury without first obtaining a ruling that said evidence is relevant and proper under Rules 401–404. In support of this request, Petras shows the Court as follows:

**1)    Passenger Concerns Relayed by Flight Attendants**

According to discovery provided by the Government, flight attendant Jamie Bergren made the second or third request to divert the plane after speaking with passenger Darge about her encounter with one or more defendants. This evidence would not be relevant to the charged offense because the offense precludes intimidation of flight attendants and crew members, not arguments with passengers.

The statement provided by flight attendant Leslie Rouch also references comments made to her by other passengers onboard the airplane. The substance of any communication between Bergren, Rouch, or any other flight attendant and any passenger, other than a named defendant, should not be mentioned, referenced, or alluded to unless and until that passenger is called to

testify about any communications with a flight attendant concerning one or more of the defendants.  Statements elicited from flight attendants as to what another individual heard or observed are clearly hearsay and should be excluded from evidence.

      2)      <u>**Words or Actions Must Be Attributable To A Particular Defendant**</u>

Each defendant in this cause has been charged with a violation of 18 U.S.C. §46504, that is, interference with a flight crew member, by intimidation.  To be found guilty, conduct constituting interference must be attributed to a specific individual and not to the group in general.  Accordingly, to avoid confusion or any tendency to interpret evidence in a manner which finds "collective guilt," the Government and its witnesses should not be permitted to reference, allude to, or mention any specific action or communication without attributing that action or communication to an individual defendant.   Pursuant to Rule 403, even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Fed. R. Evid.  403.

      3)      <u>**Testimonial Evidence Must be Precluded Unless the Source of the Information is Available for Cross-Examination at Trial**</u>

Passengers were interviewed by members of the Amarillo Police Department once the flight landed in Amarillo and all passengers de-boarded the plane.  Accounts of what these passengers saw or heard, and any attempts to ascribe certain actions or communications to any particular defendant by their seat on the plane or what they were wearing, were made in response to direct police questioning.  As a result, this evidence is clearly testimonial in nature.  Indeed, the Supreme Court held in *Crawford v. Washington,* 124 S.Ct. 1354 (2004) that statements taken

by police officers in the course of interrogations are *testimonial*.¹ The Court emphasized that the use of the term "interrogation" was not meant to be defined in a legal, technical sense, but instead, in a colloquial sense.² "An accuser who makes a formal statement to a government officer bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."³ Because statements made by these passengers are clearly testimonial, the Sixth Amendment demands that the witness be present at trial and subject to cross-examination before his or her statements can be offered into evidence.

"Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."⁴ The only exception to admission of such testimony is when the witness is truly unavailable *and* the witness has previously been subject to cross-examination.⁵ These circumstances are not

---

¹*See Crawford v. Washington,* 124 S.Ct. 1354, 1364.

²*Id.* At 1365 n. 4; *see also United States v. Vogel,* 313 F.Supp.2d 896, 901 (S.D. Ind. 2004)("[i]f the Court wanted to limit *Crawford* to statements given in the custodial setting, it could have simply borrowed the familiar definition of interrogation from the *Miranda* context. Rather than use the *Miranda* definition, the Court specifically stated that the term "interrogation" should not be taken in the technical legal sense, and provided other clear indications that its holding was a broad one," *see Crawford,* 124 S.Ct. at 1375 ("Whatever else the term [testimonial] covers, it applies *at a minimum* to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.")(emphasis added)); *see also Black's Law Dictionary* 825 (7th ed. 1999)(defining "investigatory interrogation" as "[r]outine, nonaccusatory questioning by police of a person who is not in custody.").

³*id.* at 1364; *see also Murillo v. Frank,* 316 F.Supp.2d 744, 749 (E.D. Wisc. 2004)("the United States Supreme Court has recently held unequivocally that the *Sixth Amendment Confrontation Clause* bars the use against a defendant of statements made by a non-testifying witness in the course of an interview with the police.").

⁴*id.* at 1374.

⁵*id.*

**MOTION IN LIMINE- - PETRAS - - PAGE 3**

present in this case.  For these reasons, this evidence must be excluded at trial.

Simply put, constitutional considerations requiring testimonial statements to be subject to cross-examination in criminal cases "do not evaporate when testimony happens to fall within some broad, modern hearsay exceptions, even if that exception might be justifiable in other circumstances."[6]  Admission of this evidence would be in direct violation of Petras' rights of confrontation.[7]

### 4) Evidence of Any Statements Made By Petras Regarding any Intent to Sue Southwest Airlines

Southwest Agent Bobby Tagle was interviewed by the Government in connection with this cause and a FBI-302 has been provided concerning the substance of the Government's conversation with Tagle.  Tagle, a Southwest Airlines Customer Service agent relayed that he was working at the Amarillo airport on September 3, 2015.  On that date he was approached by the six males whom he recognized as being the individuals arrested after the diversion of Southwest flight 1522 on August 31, 2015.  According to Tagle, Petras identified himself and

---

[6] *id. at* 1367 n.7.

[7] *See, e.g., United States v. Evans,* 950 F.2d 187 (5th Cir. 1991)(In this case, ATF agents tracked defendant from his home in St. Louis to El Paso, amassed evidence identifying him as the purchaser of large quantity of drugs who was headed back to St. Louis, and advised local police to stop him on the highway.  30 pounds of marijuana found in trunk and a pistol located in a sock on the floorboard behind driver's seat.  Simultaneous execution of search warrant at defendant's St. Louis home; female encountered at residence at time of search (Melton) told agents that defendant owned a gun, showed agents where gun normally kept (not there), and described the gun.  Defendant indicted for possession with intent to distribute, felon in possession of firearm, and possession of firearm in connection with drug trafficking crime.  Prosecution impermissibly elicited hearsay testimony from agent, at trial, regarding statements made about the firearm by Ms. Melton.  These statements relied upon by the government to prove up firearms counts; thus, defendant deprived of his 6th Amendment right to confront witness, firearms convictions reversed).

asked about the status of luggage belonging to Petras and the 5 other individuals.  Tagle assisted Petras and the others by arranging to have the luggage sent to San Diego.  According to the 302, Petras told Tagle that he was going to own Southwest and fly on the airline for the rest of his life as a result of legal action.  Tagle relayed that Petras was arrogant and attempted to intimidate Tagle by threatening legal action.

      Similarly, APD Officer Sanders stated in his written report that upon interrogating Petras after his arrest, Petras said that he planned on suing Southwest Airlines

      Under Rule 401, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The fact that Petras may have implied that he would take legal action against Southwest Airlines as a result of being arrested for interference with a flight attendant does not make any of the matters the jury will be asked to consider more or less probable.  This evidence would have no probative value in the present case.

      **5)**     **Evidence Regarding Flight Crew Training and Southwest Policies**

      When interviewed by the FBI, flight attendant Leslie Rouch allegedly stated that she learned in previous airline safety training that persons with intent to commit violence on an airplane will often travel in groups and use diversion tactics to mask their attempts at violence. Rouch allegedly had also received training that persons may also display non-compliant behavior in order to determine what they are able to get away with before committing to a violent act. According to Rouch, another indicator was standing up and down and going to and from the lavatories.

Captain Michelle O'Conner was interviewed by the FBI. During that interview, O'Conner is alleged to have stated that the flight crew had received training regarding potential threats while in flight. For example, many times persons traveling in groups will be disruptive to see what a crew will do or how they will react in order to determine if they have an opportunity to commit an act of violence. O'Connor was not willing to take a chance to see what might have happened if the warning signs of a potentially threatening situation were already present. Based on her training, O'Connor also believed the possibility existed there could have been others in the cabin they weren't aware of that may have been waiting for an opportunity to do something amid the disruption caused by the six men.

Petras issued a subpoena to Southwest Airlines prior to the original February trial setting and a subsequent subpoena for the June trial date requesting:

> Any and all documents, and other items, specifically including but not limited to manuals, videos; professional codes of conduct; hand-outs; brochures; or texts containing policies, procedures, and/or standards of performance utilized directly or indirectly by Southwest Airlines in the training of its employees throughout the preceding five year period, regarding disruptive or unruly passengers and the protocol and decision making process to be utilized prior to causing an airplane to be diverted for perceived safety threat or risk.

Originally, in correspondence dated March 15, 2016, Southwest took the position that this request sought materials protected as "sensitive security information." After further discussions with undersigned counsel and after having been provided with copies of the flight crew statements, Southwest asserted, on May 13, 2016 that it would produce Southwest's Pilot and Flight Attendant training and manuals on threatening, unruly, or disruptive passengers that were in effect on 8/31/2015. Further, these materials would be submitted to the TSA for approved release subject to an agreed protective order. Finally, on May 20, 2016, Southwest agreed to

provide: (1) Flight Attendant and Pilot manual provisions dealing with unruly and threatening passengers in effect between 8/31/2013 and 8/31/2015; and (2) Flight Attendant and Pilot Training materials on unruly passengers and threatening passengers that were in effect during the time periods that each of the crew members received training between 8/31/2013 and 8/31/2015. Regarding training, if these materials are not produced, the government should be precluded from eliciting any testimony that specifically describes any training received and considered by Southwest employees in connection with this incident. Further, if training materials are produced, the government should not be permitted to elicit testimony concerning training that is not covered in the materials received.

In his interview with the FBI, First Officer Matthew Waggoner allegedly stated that as a result of the on-board conversations with flight attendant Bergren he believed that a level one threat existed and began looking at the process to divert and lockdown procedures. Waggoner further stated his understanding that a level one can escalate to a level three threat in a matter of seconds and there is no reason to wait for things to get physically abusive. In a sworn affidavit, Waggoner stated, "Given the available information, the crew agreed that a level 1 threat existed and we instituted lockdown per Southwest airlines procedures.

In her sworn affidavit, Captain O'Connor stated "We followed TSA and Company procedures to safely protect the passengers. We diverted to Amarillo so that law enforcement could deal with the passengers."

Crew member Jamie Bergren stated, "The[y] refused to comply after multiple warnings and had no intention of following our directions or company policies.'

To date, the only company policies that have been produced by Southwest are:

1) Sections 6.0.0 Customer Misconduct; 6.1.0 Threatening Behavior; 6.2.0 Non-Threatening Behavior; 6.2.1 Passenger Non-Compliance with PED Policy; 6.2.2 Intoxication; 6.3.0 Deplaning/Refusal of Customer from the Flight Attendant Manual dated 4/10/2015 ;

2) Section 6.3.0 Delay or Diversion from the Flight Attendant Manual dated 7/25/2015;

3) Section 21.6.1 Crew Member Interference and In-Flight Disturbance; 17.9 Diversion Procedures; 17.9.1 Disposition of Load Manifest, Release, and Flight Plan in a Diversion from the Flight Operations Manual dated 8/31/2015.

To protect the defendants rights of confrontation, no testimony should be elicited from any government witness nor alluded to by the government regarding any policies and procedures of Southwest Airlines and/or the Transportation Security Administration that are not contained in the produced discovery in response to the above-referenced subpoena.

**6)** **Costs Incurred by Southwest Airlines in Diverting the Airplane**

The government has provided discovery regarding Southwest's estimate for the cost of the diversion of this flight into Amarillo, Texas. This estimate includes the "cost of overnight customer accommodation" in the amount of $650 with an attached receipt totaling $609.50 for snacks and drinks purchased at the airport. The estimate further assesses a total of $27,090 for the cost of customer ill will and is totally based on Southwest predictions on whether or not passengers on this flight would purchase tickets on Southwest airlines within the subsequent one year time period. Costs incurred by Southwest airlines to purchase snacks and drinks for

deplaned passengers are not relevant. Further, any alleged costs for loss of customer goodwill are purely speculative in nature and thus, if deemed relevant, would be far more prejudicial than probative in this matter and the government should be precluded from referencing, alluding to or eliciting testimony on these matters at trial.

### 7) Any Evidence that Petras Violated Terms and Conditions of Pretrial Release

Under Rule 401, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The fact that Petras violated his conditions of pretrial release does not make any of the matters the jury will be asked to consider more or less probable. The evidence would have no probative value in the present case. Because Petras' compliance with his conditions of pretrial release is irrelevant under Rule 401, it is not admissible under Rule 402. None of the permissible purposes of Rule 404(b) would be advanced by mentioning such evidence. Further, the government has not yet provided "reasonable notice in advance of trial" that it intends to introduce such evidence.

Petras was incarcerated in the Randall County Jail beginning November 20, 2015 for violating terms and conditions of pretrial release. Petras was subsequently released from custody on December 8, 2015. All of his telephone conversations during this period of incarceration were recorded. The Government obtained those recordings and has provided them in discovery. There is nothing in these conversations with any relevance, as defined under Rules 401 and 402 to the facts at issue in this case. For those reasons, this "evidence" should be excluded at trial.

## CONCLUSION

For these reasons, Petras requests that this Court order the Government's attorney to inform all government witnesses to refrain from mentioning or alluding to: 1) passenger concerns relayed to flight attendants; 2) alleged acts or words of intimidation not attributed to a specific defendant; 3)   evidence which is testimonial in nature; 4) evidence regarding any statements made by Petras concerning any intention to sue Southwest Airlines; 5) evidence regarding any specific flight crew training and/or Southwest policies that are not produced prior to trial in response to subpoena; 6) evidence regarding any costs incurred by Southwest Airlines in diverting the airplane, specifically the costs of overnight customer accommodation and costs of customer ill will; and 7) any violation of the terms and conditions of pretrial release by Petras; and  any telephone conversations involving Petras while incarcerated at the Randall County jail; without first obtaining a ruling from the Court, outside the presence of the jury, that such evidence is relevant and properly admitted.

Respectfully submitted,

JASON  A. HAWKINS
Federal Public Defender
Northern District of Texas

BY:  /s/ ***BONITA L. GUNDEN***
BONITA L. GUNDEN
Asst. Federal Public Defender
Texas State Bar No. 08620450
Federal Public Defender's Office
500 S. Taylor, Suite 110
Amarillo, Texas 79101
Telephone:  (806) 324-2370
Fax: (806) 324-2372
E-mail: bonita_gunden@fd.org@fd.org
**Attorney for Defendant**
**JONATHAN KHALID PETRAS**

## CERTIFICATE OF CONFERENCE

I, BONITA L. GUNDEN, hereby certify that Joshua Frausto, the Assistant United States Attorney assigned to this matter, agrees in part and is opposed in part to the relief requested in this motion.

/s/ ***BONITA L. GUNDEN***
BONITA L. GUNDEN
Assistant Federal Public Defender

## CERTIFICATE OF SERVICE

I, BONITA L. GUNDEN, certify that on the 23rd day of May 2016, I electronically filed the foregoing First Supplemental Motion in Limine with the clerk for th U.S. District Court, Northern District of Texas, using the electronic filing system for the court. The electronic case filing system sent a "Notice of Electronic Filing" to AUSA Joshua Frausto, Slater Elza, Thomas Farris, and John Ben Blanchard, all of whom have consented in writing to accept this Notice as service of this document by electronic means.

/ s/ ***BONITA L. GUNDEN***
BONITA L. GUNDEN
Assistant Federal Public Defender