IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Criminal Action No. 2:15-CR-087-D |
| VS. | § | |
| | § | |
| JONATHAN KHALID PETRAS et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

Defendants Jonathan Khalid Petras ("Petras") and Wisam Imad Shaker ("Shaker"), who were convicted by a jury of the offense of interference with flight crew, in violation of 49 U.S.C. § 46504,[1] each move for a new trial under Fed. R. Crim. P. 33, contending that the government solicited or failed to correct false testimony at trial.[2] For the reasons that follow, the court denies the motions.[3]

I

Petras and Shaker maintain that the government used evidence of a text message sent by defendant Essa Solaqa ("Solaqa") to defendant Khalid Yohana ("Yohana") to elicit false trial testimony from Yohana.[4] Defendants' Exhibit 100 ("Ex. 100")—which defendants

---

[1]Each was also charged as an aider and abettor under 18 U.S.C. § 2.

[2]Shaker adopts Petras' motion in full.

[3]The government has not responded to defendants' motions.

[4]Parts of this recitation of the background facts, and defendants' contentions, are taken from Petras' motion for new trial.

offered for record purposes only—constitutes part of the text message conversation involving Yohana and Solaqa, both of whom were acquitted.  The conversation was taken from an Apple iPhone Extraction Report ("Extraction Report") prepared by the North Texas Regional Computer Forensic Laboratory based on one of the cell phones seized by the government in its investigation.[5]  Yohana testified at trial that, at some point, he sent a text message stating "we will inshallah."[6]  Yohana also testified that Solaqa sent him a text message at 10:51 p.m. on August 31, 2015 that read, "F--k America."  The government asserted that this text message was sent at approximately the time the plane landed in Amarillo.

Defendants objected to Yohana's testimony about the "F--k America" text message on the grounds of lack of foundation and hearsay.  The court overruled the objections.  Later in the trial, after Yohana had finished testifying, another defense witness had started testifying, and the luncheon recess had been taken, defendants objected again, based on lack of foundation, relevance grounds, and Fed. R. Evid. 403; they moved for a mistrial; and they offered Ex. 100 for record purposes on appeal.  The court denied the motion for a mistrial.

---

[5]In the fact section of his brief, Petras asserts that the Extraction Report—the original form of Ex. 100—identifies the participants to the text message conversation only by their phone numbers, not by their names, and that the government hand wrote the names "Solaqa" and "Yohana" next to certain phone numbers on Ex. 100.  But Petras and Shaker do not contend that Solaqa or Yohana was incorrectly identified as sending or receiving any text message at issue.

[6]The  Merriam-Webster Dictionary defines "inshallah" to mean "if Allah wills: God willing."

Regarding the Rule 403 objection, the court stated that it understood that the government had offered the text message to rebut the defendants' theme that, once the incident occurred on the plane, the defendants went to sleep, thought the incident was behind them, and were in shock when the plane landed in Amarillo and they were arrested.  The government relied on the  "F--k America" text message in closing argument to contend that the defendants had engaged in disruptive and noncompliant conduct throughout the flight, and to rebut the defendants' contention that they had been peaceful, calm, and asleep during the flight. During closing argument, the government displayed a slide containing the "F--k America" text message, and it argued that Solaqa was awake and typing an aggressive, anti-American message as the plane was landing.

Petras and Shaker maintain that, after trial, they learned for the first time that Yohana's testimony regarding the time Solaqa sent the text message was false.  They contend that Ex. 100 is time stamped "UTC+0," which stands for Coordinated Universal Time and is synonymous with Greenwich Mean Time, and that, during Daylight Saving Time, UTC is five hours ahead of Central Daylight Time, the time observed in Amarillo on the date in question.  Petras and Shaker therefore posit that Solaqa's text message was actually sent over two hours *before* the flight took off, not as the plane was landing, and therefore does not support the government's time line.  They also maintain that, had the court known the correct time the text message was sent, it would not have overruled their objections to this evidence.

Petras and Shaker also argue that the government's manner of disclosing the information relevant to this issue deprived them of the best opportunity to discover the

falsehood before the close of the evidence.  They maintain that Ex. 100 was not disclosed before trial as an exhibit; the original source (i.e., the Extraction Report) was not identified on Ex. 100 or in the government's questions to Yohana; Ex. 100 was not admitted in evidence; and the government provided only one copy of Ex. 100 to Yohana's attorney when it began questioning Yohana.  Although Petras and Shaker acknowledge that they were provided the Extraction Report during discovery, they maintain that they would have discovered the falsehood before the close of evidence had the government done one of two things.  First, the government could have included the entire text message conversation in Ex. 100.  Ex. 100 includes only pages 82 through 87 of the 588-page Extraction Report.  The conversation continues, however, for three additional pages.  The text messages on page 88, for example, show that the defendants had not boarded the flight yet because there is discussion about whether someone should get extra socks before takeoff.  Second, the government could have specified which document Ex. 100 was excerpted from, which would have given the defendants the ability to identify the particular report and discover the parts of the report that contradicted the government's time line.

## II

"A court may grant a new trial if it is required in the interests of justice."  *United States v. Arnold*, 416 F.3d 349, 360 (5th Cir. 2005) (citing Rule 33(a)).  The knowing use of false testimony is commonly referred to as a *Napue* violation, after the Supreme Court's opinion in *Napue v. Illinois*, 360 U.S. 264 (1959).  A *Napue* violation occurs when the prosecuting attorney knows that a witness' testimony is false, or when another government

- 4 -

attorney knows of the false testimony and does nothing to correct it. *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997) (citing *Giglio v. United States*, 405 U.S. 150, 153 (1972)).  "A new trial based on false testimony is justified if there is any reasonable likelihood that the false testimony affected the judgment of the jury." *United States v. Wall*, 389 F.3d 457, 473 (5th Cir. 2004) (citing *United States v. MMR Corp.*, 954 F.2d 1040, 1047 (5th Cir. 1992)).  "Hence, a Rule 33 motion for false testimony is not as demanding a standard with respect to the impact the new evidence might have on the outcome of the trial." *Id.*; *see MMR Corp.*, 954 F.2d at 1046-47 ("The general rule is that newly discovered evidence will not entitle a defendant to a new trial under Rule 33 unless the evidence *probably* would produce a different result," but "if the government used false testimony and knew or should have known of its falsity, a new trial must be held if there was *any reasonable likelihood* that the false testimony affected the judgment of the jury." (emphasis in original) (citations omitted)); *see also Wall*, 389 F.3d at 466 ("Generally, this court has held that the trial court should not grant a motion for new trial unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict." (citing *O'Keefe*, 128 F.3d at 898)).

The false testimony standard requires a finding that the testimony in question was actually false, and also incorporates the first four elements of the standard used for analyzing newly discovered evidence: "(1) the evidence was unknown to defendant at the time of trial; (2) defendant's failure to learn of the evidence was not due to a lack of diligence; and (3) the evidence is material, not merely cumulative or impeaching." *Wall*, 389 F.3d at 473 (citing

*MMR Corp.*, 954 F.2d at 1047).  "'[A] new trial based upon a *Napue* violation is proper only if (1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material.'"  *United States v. Stanford*, 823 F.3d 814, 838-39 (5th Cir. 2016) (quoting *O'Keefe*, 128 F.3d at 893).  But "[e]ven assuming that the prosecution presented (or failed to correct) false testimony, the critical factor is materiality."  *Id.* (parenthesis in original).

The Supreme Court has "defined materiality in terms of a 'reasonable probability' of a different outcome."  *O'Keefe*, 128 F.3d at 894 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)); *see also Stanford*, 823 F.3d at 838-39.  "Such a reasonable probability results when nondisclosure places the case in a different light so as to undermine confidence in the verdict."  *O'Keefe*, 128 F.3d at 894 (citing *Whitley*, 514 U.S. at 435).  "The relevant inquiry examines the challenged evidence collectively, not on an item-by-item basis."  *Id.* (citing *Whitley*, 514 U.S. at 436).  "'To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.'"  *Id.* (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991)).  "[M]ateriality is a method of maintaining the equal playing field between the prosecution and the defense necessary to allow the jury to perform its truth-seeking function."  *Id.* at 895.

"The grant of a new trial is necessarily an extreme measure, because it is not the role of the judge to sit as a thirteenth member of the jury."  *Id.* at 898 (citation omitted).  "The judge's job, in connection with an alleged *Napue* violation, is to grant a new trial when the

fact-finding function of the jury has been corrupted by a material falsehood of which the government was aware." *Id.* Further, "district courts have 'considerable discretion' with respect to Rule 33 motions." *MMR Corp.*, 954 F.2d at 1047 (quoting *United States v. Simmons*, 714 F.2d 29, 31 (5th Cir. 1983)) (citing *United States v. Adi*, 759 F.2d 404, 407 (5th Cir. 1985) (a "clear abuse of discretion" must be demonstrated)); *see also Stanford*, 823 F.3d at 838 (holding that district court's order denying new trial based on false testimony is reviewed under abuse of discretion standard—a standard that "'is necessarily deferential to the trial court because we have only read the record, and have not seen the impact of the witnesses on the jury or observed the demeanor of the witnesses ourselves, as has the trial judge'" (quoting *O'Keefe*, 128 F.3d at 893)).

III

Petras and Shaker have not made the necessary showing to warrant granting a new trial because the false testimony was not material, that is, there is no reasonable probability that the jury would have acquitted Petras and Shaker had the text message been excluded from evidence or had the true time of the text been introduced in evidence.  It is important to focus on the fact that Petras and Shaker only assert that Yohana's testimony was false concerning the *time* the text message was sent.  They do not contend that Yohana's testimony regarding the *substance* of the text message ("F--k America") and the *identities* of the sender (Solaqa) and receiver (Yohana) was false.  Petras and Shaker appear to argue that, had the court been aware of the correct time that the text message was sent, it would have sustained their objections to admitting the text message in evidence.  But even if the court had been

- 7 -

aware at trial that Solaqa's text message was sent before the defendants boarded the flight, not as the plane was landing, it would nevertheless have overruled the defendants' objections. Solaqa's text message would still have had probative value (and would not have been excluded under Rule 403) because it tends to show that Solaqa was not peaceful or calm around the time that he was at the airport before boarding the plane.[7]

Additionally, Solaqa, who the government asserts sent the text message, and Yohana, the witness who testified about receiving the text message, are the two defendants who are most closely associated with this text message and the testimony offered about it at trial, and both were acquitted. The jury therefore did not find this testimony, in combination with the other evidence offered at trial, to be sufficiently probative to convict Yohana or Solaqa. Nor did the jury find that Yohana's testimony about the text message sufficiently impacted his overall credibility as a witness as to warrant finding him guilty. *See O'Keefe*, 128 F.3d at 893 ("False testimony for these purposes includes testimony that affects only the credibility of a witness." (citing *Napue*, 360 U.S. at 269-270)). The court therefore concludes that there is no reasonable likelihood that the false testimony concerning the time of the text message affected the judgment of the jury.

The government also presented substantial evidence, in addition to Yohana's testimony about Solaqa's text message, establishing that Petras and Shaker were displaying

---

[7]A text message stating, "Did any of you guys get chosen for a 'random' security check?" was sent approximately seven minutes before Solaqa's "F--k America" text message. *See* Ex. 100 at 6; Extraction Report at 87. It can therefore be reasonably inferred that Solaqa was at or near the San Diego airport at the time he sent the text message at issue.

escalating aggression and noncompliance throughout the flight (and thus discrediting the defendants' assertions that Petras and Shaker were peaceful, calm, and sleeping throughout the flight). *See, e.g., Stanford*, 823 F.3d at 839 (explaining that defendant challenged witness' false testimony regarding phone conversations he had with defendant between September and November 2011 on the ground that phone records, subpoenaed by the government, did not show any calls to defendant from witness' phones until November 8, and finding that such false testimony "[did] not rise to the level of materiality" because, even if no call occurred until November 8, other evidence showed that witness was communicating with defendant as early as August, "which undermine[d] [defendant's] contention that he did not become involved in the conspiracy until later"); *Wall*, 389 F.3d at 474-75 (holding that district court abused its discretion when granting Rule 33 motion for new trial, and in so doing, explaining that "[w]hether his motion is based on newly discovered evidence, false testimony, or prosecutorial misconduct none of these grounds, singularly or collectively, provided an adequate vehicle under the facts of this case for the district court to disturb the jury's verdict," and that "[t]his is particularly true in light of the considerable evidence of guilt, which even the district court recognized in its opinion"). Accordingly, the court concludes on this basis as well that there is no reasonable probability that the jury would have rendered a different judgment with respect to Petras and Shaker had defendants been able to establish that Solaqa sent the "F--k America" text message to Yohana before they boarded the flight rather than as the plane was landing.

Moreover, the government provided the defendants with the Extraction Report, which

contained the pages used in Ex. 100, during pretrial discovery.  And before questioning Yohana at trial, the government provided Yohana's attorney a copy of Ex. 100 itself,  which states "UTC+0" after the time of each text message in the exhibit.  Although the defendants had this information, they failed to follow up on Yohana's testimony about the timing of the text message at issue by directing Yohana to other pages in the Extraction Report or by asking Yohana about the "UTC+0" timestamp in Ex. 100.  *See, e.g., United States v. Bethley*, 973 F.2d 396, 399 (5th Cir. 1992) (rejecting *Napue* claim when government provided defendant with witness' rap sheets and plea agreement in related case, and defendant's counsel failed to ask questions regarding witness' denial of past conviction); *see also Stanford*, 823 F.3d at 839 n.26 (denying *Napue* claim on materiality grounds, but further explaining that "there [was] an additional reason to deny [defendant's] *Napue* claim based on the telephone calls" given that defendant presumably had access to his phone records at trial or could have obtained them); *cf. O'Keefe*, 128 F.3d at 894 ("[C]ourts have been extremely reluctant to find a deprivation of due process when the prosecution has provided the defense with the necessary information and it can utilize the information, but decides, for tactical reasons, not to use such information." (citation omitted)).

Petras and Shaker emphasize that the government displayed Solaqa's "F--k America" text message during closing argument.  The court recognizes that, "even when the defense is aware of the falsity of the testimony, a deprivation of due process may result when the information has been provided to the defense but the government reinforces the falsehood by capitalizing on it in its closing argument."  *O'Keefe*, 128 F.3d at 894-95 (citing *United*

- 10 -

*States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977)). Such a deprivation of due process, however, did not occur in this case. As discussed above, the evidence concerning the content of the text message ("F--k America"), and the identities of the sender (Solaqa) and receiver (Yohana) of the text message, was *true*. Only the evidence regarding *the time* the text message was sent was false, and any discussion by the government of such timing, and implications thereof, during trial does not rise to the level required for a new trial, especially considering that the court would have permitted the true testimony had it known the correct timing of the text message. *See, e.g., id.* at 897 n.11 ("This finding that the falsehoods were not material is not negated by the prosecution's half-hearted attempt to bolster the credibility of [government witness who made false statements] on redirect and in closing arguments. Any such bolstering as may have occurred does not rise to the level of bolstering in cases where we have reversed the denial of a new trial." (citing *Sanfilippo*, 564 F.2d at 178-79)).

\* \* \*

Accordingly, for the reasons explained, the court denies Petras' and Shaker's motions for new trial.

**SO ORDERED**.

August 16, 2016.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 11 -